

**IT IS ORDERED as set forth below:**

Date: August 5, 2022

_____
**Paul Baisier**
**U.S. Bankruptcy Court Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | CHAPTER 11 |
| BLUE WHALE STUDIOS, LLC, | : | |
| | : | CASE NO. 22-53632-PMB |
| Debtor. | : | |
| | : | |
| MATTHEW SILVA, | : | |
| | : | |
| Movant, | : | |
| | : | |
| v. | : | CONTESTED MATTER |
| | : | |
| BLUE WHALE STUDIOS, LLC, | : | |
| | : | |
| Respondent. | : | |

**ORDER GRANTING MATTHEW SILVA'S**
**MOTION TO DISMISS CHAPTER 11 CASE**

Before the Court are the *Motion to Dismiss Case Pursuant to 11 U.S.C. § 1112* (Docket No. 30)(the "Motion") filed by Matthew Silva ("Mr. Silva") on May 19, 2022, and the *Response in Opposition to Matthew Silva's Motion to Dismiss Case Pursuant to 11 U.S.C. § 1112* (Docket No. 72)(the "Response") filed by the above-captioned debtor ("Debtor" or "Blue Whale") on July 13,

2022.[1] On May 11, 2022, Debtor filed a voluntary petition under Subchapter V of Chapter 11 of the Bankruptcy Code (Docket No. 1)(the "Petition"). On the same day, Debtor filed three (3) emergency motions that were heard by the Court on May 13, 2022 (the "First Day Hearing"). At the First Day Hearing, Mr. Silva appeared in opposition to the three (3) motions, stating that Debtor had no authority to file for bankruptcy. Mr. Silva's oral objection was shortly followed by the filing of the Motion. In the Motion, Mr. Silva argues that Debtor's bankruptcy case must be dismissed because the case was filed without adequate authorization and in bad faith.[2]

The Court held a hearing on the Motion and the Response on July 18, 2022 (the "Hearing"). William Rountree and Caitlyn Powers, counsel for Debtor, Jonah Levy ("Mr. Levy"), a co-founder of Debtor, and Nabil Ismail ("Mr. Ismail"), Debtor's director of operations, appeared at the Hearing on behalf of Debtor. Daniel Wilder, counsel for Mr. Silva, Mr. Silva, Tamara Ogier, the Subchapter V Trustee, and Tom Dworshak (on behalf of the United States Trustee) also appeared at the Hearing. The Court heard sworn testimony by Mr. Levy, Mr. Silva, and Mr. Ismail and took evidence at the Hearing. This matter constitutes a core proceeding over which this Court has subject matter jurisdiction. *See* 28 U.S.C. §§ 157(b)(2)(A), 1334.

## FINDINGS OF FACT

Debtor is a Georgia limited liability company formed by Mr. Levy and Mr. Silva jointly in July of 2016. Debtor operates a specialty makeup, costume, and prop facility, serving the entertainment industry. At formation and at all other relevant times, Debtor is a member-managed

---

[1] Shortly after Mr. Silva filed the Motion, the parties filed a *Joint Motion for Referral to Mediation* on May 24, 2022 in the Adversary Proceeding, Case No. 22-5085-PMB (the "Adversary Proceeding")(Adversary Proceeding, Docket No. 2) and the Court entered an *Order Authorizing Mediation* on May 26, 2022 (Adversary Proceeding, Docket No. 4)(the "Mediation"). In light of the Mediation, the Court rescheduled the hearing date for the Motion and allowed Debtor to delay filing its Response. Although following the Hearing the parties appear to have discussed resuming the Mediation, Mr. Silva refused through counsel to join a request that this ruling be delayed while the Mediation was pursued further.

[2] Because the Court finds that the filing of the Petition was not authorized, it does not address the alternate ground of bad faith.

2

Georgia limited liability company, and Mr. Levy and Mr. Silva each own a fifty percent (50%) membership interest in Debtor.[3] In the Spring of 2021, Mr. Levy learned of certain conduct by Mr. Silva related to the business, and they had a falling out. The parties dispute the exact details of the falling out, but the basic facts are not disputed and are outlined below.

Around April of 2021, Mr. Levy learned from another Blue Whale employee that for the prior roughly six (6) months Mr. Silva had been involved in a secret relationship with another person employed at Blue Whale. That person had initially come to Blue Whale as a student intern/artist in residence, and the relationship violated Blue Whale's oral, zero-tolerance policy of fraternizing with students. Mr. Levy testified that he and Mr. Ismail asked Mr. Silva to temporarily step away from the business while they determined the best way to proceed to regain the trust of Debtor's employees. Mr. Silva testified that he initially agreed to step away, under the impression that his time away from Debtor would only last about two (2) weeks.

After those two (2) weeks, Mr. Levy, Mr. Ismail, and Mr. Silva met again, but this time they concluded that Mr. Silva would no longer be a part of the company. Mr. Levy and Mr. Ismail testified that Mr. Silva agreed to step down; however, Mr. Silva stated that he was given no choice and was forced out of day-to-day involvement in Debtor. No change was made in the ownership of Blue Whale in connection with this "stepping away" by Mr. Silva, however long it was intended to last.[4] Following this meeting, Mr. Silva retained access to Blue Whale's bank accounts and, on July 30, 2021, he went to Truist Bank in person, withdrew all of the funds from Blue Whale's bank accounts

---

[3] The fifty-fifty (50/50) ownership of Debtor by Mr. Silva and Mr. Levy is wholly supported by the testimony of both Mr. Levy and Mr. Silva and is provided for in the operating agreement of Blue Whale (the "<u>Alleged Operating Agreement</u>") presented at the Hearing by Mr. Silva. The only suggestion of any other ownership arrangement was in the testimony of Mr. Ismail, who claimed that he, Mr. Levy and Mr. Silva each own one-third (1/3) of Debtor, although he appeared to concede this alleged arrangement (which was not connected to Mr. Silva's stepping away) had never been documented. The Court did not find this testimony to be credible on this issue, as it was not supported in any way by any other documentary evidence or by the testimony of Mr. Levy or Mr. Silva.

[4] From the testimony it seems that some sort of buyout or severance may have been discussed at some point, but no such arrangement was ever consummated; instead, state court litigation, and later this case, ultimately commenced.

3

and placed them into an account in his name at Wells Fargo Bank (the "Wells Fargo Account").  He claimed that he did this because he was concerned that Debtor was wasting its funds (by, for example, giving its employees some paid time off), although he also admitted that his counsel had advised this course of action to provide him with leverage.  After the funds were taken, there were discussions about terms on which they might be made available to Debtor, and some of the funds were ultimately returned.[5]  As of the date of the Hearing, $186,858.22 of Blue Whale's funds remained in the Wells Fargo Account (the "Remaining Funds").[6]

On November 1, 2021, Mr. Levy (on behalf of himself and Blue Whale) filed a complaint against Mr. Silva and Blue Whale in the Superior Court of Cobb County, Civil Action No. 21108134 (the "State Court Action") for breaches of fiduciary duty, conversion, and judicial dissolution.  *See* Exhibit M3.  Other than the service of the complaint and the filing of answers, no activity appears to have taken place in the State Court Action prior to the filing of this bankruptcy case.  Debtor filed the Petition and then removed the State Court Action to this Court on May 20, 2022.  *See Notice of Removal*, Docket No. 33.[7]

---

[5] On July 30, 2021, Mr. Silva withdrew $271,647.99 from Blue Whale's bank accounts and placed it into the Wells Fargo Account.  Mr. Silva promptly returned $4,600.00 to Blue Whale's bank accounts to prevent checks drawn on Blue Whale's accounts from bouncing.  *See* Exhibit M2.  In connection with negotiations between the parties in August 2021, Mr. Silva returned an additional $80,000.00 to Blue Whale.

[6] On June 29, 2022, Debtor and the Subchapter V Trustee filed a *Joint Emergency Motion for Entry of an Order Enforcing the Automatic Stay and Expanding Powers of the Subchapter V Trustee* (Docket No. 62).  On July 7, 2022, Mr. Silva filed a *Response with Opposition to Joint Emergency Motion for Entry of an Order Enforcing the Automatic Stay and Expanding Powers of the Subchaper (sic.) V Trustee* (Docket No. 67).  This matter was also addressed at the Hearing.  On July 22, 2022, the Court entered an *Interim Order on Joint Motion to Enforce the Automatic Stay and Expand Powers of the Subchapter V Trustee Requiring Matthew Silva to Maintain Funds* (Docket No. 80), which instructed Mr. Silva to maintain all of the Remaining Funds in the Wells Fargo Account for so long as this bankruptcy case remains pending or until further order of this Court (the "Order to Maintain Funds").

[7] In the Adversary Proceeding, Mr. Silva filed a *Motion to Abstain from Hearing and Remand to the Superior Court of Cobb County Georgia* on June 20, 2022, seeking remand of the Adversary Proceeding back to state court (Adversary Proceeding, Docket No. 8)(the "Motion to Remand").  Debtor filed a *Response in Opposition to Matthew R. Silva's Motion to Abstain from Hearing and Remand to the Superior Court of Cobb County, Georgia* on July 13, 2022 (Adversary Proceeding, Docket No. 10).  In light of the dismissal of this bankruptcy case ordered herein, the Motion to Remand will be granted by the Court through separate order in the Adversary Proceeding.

The Petition is signed by Jonah Levy in his capacity as "CEO" of Debtor.[8]  Filed along with the Petition was a *Certified Copy of Resolution of the Managing Member of Blue Whale Studios, LLC* (Docket No. 2)(the "Corporate Resolution").  On May 19, 2022, Debtor filed an amended corporate resolution (Docket No. 29)(the "Amended Corporate Resolution").  Mr. Levy certifies in the Amended Corporate Resolution that on May 11, 2022 Debtor adopted a resolution empowering the "Managing Member of the Company to prepare, file and execute the Petition for Relief in Title 11, United States Code, Chapter 11 for Blue Whale Studios, LLC."  The Amended Corporate Resolution is only signed by Jonah Levy as "CEO" and "Managing Member."[9]  Neither the Corporate Resolution or the Amended Corporate Resolution asserts that the members of Debtor authorized the resolution or the filing of the Petition.  To the contrary, Mr. Silva testified that he did not meet with Mr. Levy at any time about the filing of the Petition, and did not approve the filing of the Petition.  This testimony is not disputed.  Instead, Mr. Silva opposes the filing and argues that he is a fifty percent (50%) owner of Debtor along with Mr. Levy and that, based on the Alleged Operating Agreement and/or applicable Georgia law, Debtor is a member-managed Georgia limited liability company and that both members must approve the filing of its bankruptcy petition.[10]  Debtor disputes the existence of an operating agreement and argues that, under Georgia law, only Mr. Levy's approval of the bankruptcy filing was

---

[8] Mr. Levy was not authorized in the Corporate Resolution or the Amended Corporate Resolution to sign the Petition as "CEO," but only as "Managing Member."

[9] There is no evidence anywhere in the record that Debtor has a "Managing Member."  No such position is created by the Alleged Operating Agreement, or by applicable law.  Instead, the record is clear that Debtor is managed by its two (2) members.

[10] Mr. Silva testified that he found the Alleged Operating Agreement in Blue Whale's corporate records.  That document was admitted into evidence and includes Mr. Levy's admitted signature on what appears to be a cover page from Legalzoom.  There is, however, no signature by either party on the signature page of the Alleged Operating Agreement.  *See* Exhibit M1.  Debtor disputes the existence of a controlling operating agreement, but does not dispute that Blue Whale is a fifty-fifty (50/50), member-managed Georgia limited liability company.  Based on the testimony of Mr. Silva and Mr. Levy, it does not appear that they ever agreed on this form of operating agreement, such that if the Court had to determine whether this document is in effect as to Debtor, the Court would find that it is not.  However, as outlined below, whether or not the Alleged Operating Agreement is in effect, this bankruptcy case was not properly authorized.

5

required because Mr. Silva had a "conflicting interest" regarding filing of the Petition based on the dispute discussed above, including his taking of Debtor's funds and the State Court Action.

## DISCUSSION

"[I]t is generally accepted that a bankruptcy case filed on behalf of an entity by one without authority under state law to so act for that entity is improper and must be dismissed." *In re H&W Food Mart. LLC,* 461 B.R. 904 (Bankr. N.D. Ga. 2011)(quoting *In re A–Z Electronics, 907 LLC,* 350 B.R. 886, 891 (Bankr. D. Idaho 2006)); *see also In re ComScape Telecommunications, Inc.,* 423 B.R. 816, 830 (Bankr. S.D. Ohio 2010)("Whenever a court 'finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative but to dismiss the petition.'"). The moving party must "demonstrate by a preponderance of the evidence" that the filing of the case was not authorized. *In re ComScape Telecommunications, Inc.,* 423 B.R. at 830.

Whether the filing of the Petition was authorized depends upon the applicable state law and the facts of the case. *See In re A–Z Electronics, 907 LLC,* 350 B.R. 886, 889 (Bankr. D. Idaho 2006)("State law, not bankruptcy law, is used to determine whether the party signing the entity petition had the authority to do so."). Blue Whale is a Georgia limited liability company; therefore, the Court must look to the Georgia Limited Liability Company Act (the "LLC Act") to determine authority. *See* Exhibit M6. The LLC Act generally operates as a backdrop to any organization's operating agreement. If an operating agreement exists, the terms of that agreement generally control; the LLC Act often has provisions that provide the applicable rule "unless the operating agreement provides otherwise." *See e.g.* O.C.G.A. § 14-11-307(a)("The provisions of this Code section shall apply to a limited liability company unless its articles of organization or a written operating agreement provides that they shall not apply."); O.C.G.A. § 14-11-308(a)("Except as otherwise provided …in the articles of organization or a written operating agreement…"). If there is no operating agreement,

then the LLC Act generally provides the applicable legal framework.  Therefore, the Court will first look to the terms of the Alleged Operating Agreement; however, given the disagreement as to the validity of the Alleged Operating Agreement, the Court will also look to the LLC Act.  As outlined below, they both lead to the same conclusion – that the filing of this case was not properly authorized.

*The Alleged Operating Agreement*

The terms of the Alleged Operating Agreement provide for the management of Blue Whale by its "Members".  *See* Exhibit M1, ¶ 4.1(A).  Under the Alleged Operating Agreement, "[u]nless greater or other authorization is required pursuant to [the Alleged Operating Agreement] or under [the LLC Act] for [Debtor] to engage in an activity or transaction, <u>all activities or transactions must be approved by the Members, to constitute the act of [Debtor] or serve to bind [Debtor]</u>. . . Without such approval, no Members acting alone may bind [Debtor] to any agreement with or obligation to any third party or represent or claim to have the ability to so bind [Debtor]."  *Id.*, ¶ 4.1(B)(emphasis added).[11]  Section 6.1 of the Alleged Operating Agreement provides that, with the same caveats as Section 4.1(B), "the vote of the Members holding at least a majority of the Voting Interest of [Debtor] is required to approve or carry out an action of the members."  Section 6.2 of the Alleged Operating Agreement permits approval of matters without a meeting, but only if members holding a voting interest that could approve the action sign a consent to the action.  The foregoing are the only provisions of the Alleged Operating Agreement that discuss the approval of an action like the filing of the Petition.  Because Mr. Levy and Mr. Silva each own a fifty percent (50%) voting interest in Debtor, the case could not be filed without Mr. Silva's approval under the terms of the Alleged Operating Agreement.  Debtor and Mr. Levy do not contend that Mr. Silva, as a member of Blue

---

[11] This same sentiment is expressed in Section 2.6 of the Alleged Operating Agreement, which says; "[u]nless expressly provided for in this [Alleged Operating Agreement], no Member, acting alone, has any authority to undertake or assume any obligation, debt, or responsibility, <u>or otherwise act on behalf of</u>, [Debtor] or any other member." *Id.*, ¶ 2.6 (emphasis added).

7

Whale, approved the filing of the Petition. Therefore, under the terms of the Alleged Operating Agreement, the filing of the Petition on behalf of Blue Whale was not properly authorized, and the case must be dismissed.

If, however, the Alleged Operating Agreement is not a controlling document (perhaps because it is not signed and was not otherwise agreed to), and there is no other controlling operating agreement (and the parties have not identified any alternative), then the Court must look to the provisions of the LLC Act to determine what is required to authorize the filing of the Petition.

*The LLC Act*

Under the LLC Act, when, as here, management is vested in the members,[12] "each member shall have one vote with respect to, and the affirmative vote, approval, or consent of a majority of the members shall be required to decide, any matter arising in connection with the business and affairs of the limited liability company." O.C.G.A. § 14-11-308(a)(1). Bankruptcy clearly affects a company's business and affairs; in fact, the purpose of a Chapter 11 case is to reorganize a company's business and restructure its relationship and affairs with creditors and clients. *See In re Seven Stars on the Hudson Corp.*, 618 B.R. 333, 339 (Bankr. S.D. Fla. 2020)("Congress enact[ed] the SBRA to 'streamline the bankruptcy process by which small businesses debtors reorganize and rehabilitate their financial affairs.'"). Under Section 308 of the LLC Act, the filing of the Petition was not adequately authorized because it was only authorized by Mr. Levy and, as a fifty percent (50%) owner, he does not constitute "a majority of the members."

In the Response, Debtor cited to O.C.G.A. § 14-11-301 to argue that Mr. Levy, acting alone, had authority to place Blue Whale into bankruptcy because "the act of any member, including but not limited to, the execution in the name of the limited liability company of any instrument for apparently

---

[12] O.C.G.A. § 14-11-304(a)("Unless the articles of organization or a written operating agreement vest management of the limited liability company in a manager or managers, management of the business affairs of the limited liability company shall be vested in the members, …").

8

carrying on in the usual way the business and affairs of the limited liability company of which he or she is a member, binds the limited liability company." Filing a bankruptcy petition does not, however, constitute carrying on business in the usual way, because "the relief sought by petitioners in a Chapter 11 case, [] is anything but the normal process by which an entity conducts its business." *In Re SWG Associates,* 199 B.R. 557, 559 (Bankr. W.D. Penn. 1996). In fact, many provisions in the Bankruptcy Code prohibit entities from conducting certain aspects of their day-to-day business unless and until they seek court approval.[13] Therefore, because filing for bankruptcy does not constitute "carrying on business in the usual way," Mr. Levy's act of authorizing the filing does not, under Section 14-11-301(c), bind Debtor.[14]

The foregoing analysis is consistent with the alternative holding in *In re H&H Food Mart, LLC*, 461 B.R. 904 (Bankr. N.D. Ga. 2011), which Mr. Silva references in the Motion. In *H&H Food Mart*, the membership interest of one of H&H Food Mart's members was transferred to his Chapter 7 bankruptcy estate when he filed an individual Chapter 7 bankruptcy case, and was thus controlled by his duly appointed Chapter 7 trustee. The Chapter 7 trustee did not authorize the bankruptcy filing. As a result, Judge Drake held that a bankruptcy petition, filed with the authority of only one (1) fifty percent (50%) member, was not adequately authorized under the operating agreement or Georgia law, and so he dismissed the case.

Debtor did not mention any of the foregoing LLC Act provisions or case law in its argument at the Hearing, but instead relied solely on O.C.G.A. § 14-11-307. In short, Debtor argued that only

---

[13] *See e.g. Emergency Motion of the Debtor for Entry of an Order (A) Authorizing Debtor to Pay All Prepetition Payroll Obligations, and (B) Directing Banks to Honor Related Transfers*, Docket No. 5, p. 6 ("The Debtors seek authority to continue to pay the Independent Contractors in the *ordinary course of business* on a postpetition basis.")(emphasis added).

[14] O.C.G.A. § 14-11-301(c)("An act of a manager or a member that is not apparently for the carrying on in the usual way the business or affairs of the limited liability company does not bind the limited liability company..."). Debtor also cited O.C.G.A. § 14-11-304 in the Response; however, that section merely authorizes "the members" to conduct the business of a member-managed limited liability company but does not modify the approval requirements of O.C.G.A. § 14-11-308, discussed above. As noted *infra*, Debtor also abandoned the arguments under both Sections 14-11-301 and 14-11-304 at the Hearing, proceeding there only under O.C.G.A. § 14-11-307.

9

Mr. Levy was entitled to vote on the bankruptcy filing because Mr. Silva was not qualified to vote under O.C.G.A. § 14-11-307, and thus there was majority approval of the filing of the Petition. More specifically, Debtor contends that Mr. Silva was not a "qualified member" as defined in Section 307(g) because of his "conflicting interest" regarding the bankruptcy filing purportedly arising out of his fall out with Mr. Levy, his taking of company funds and the current State Court Action pending against him. Thus, Debtor asserts that Mr. Levy's approval of the bankruptcy filing constitutes approval by a majority of all the "qualified members" in accordance with Section 307(f). Upon review of Section 14-11-307, however, it does not permit Mr. Levy alone to authorize the filing of the Petition.[15]

First, Section 14-11-307 applies to "transactions." It does not apply to all decisions regarding Debtor – only "transactions."[16] The filing of the Petition is not a "transaction" in the way that word is commonly used – it is instead the commencement of a legal process for Debtor to seek relief under the Bankruptcy Code in hopes of reorganizing its business.

Additionally, the way the definition of "conflicting interest" in O.C.G.A. § 14-11-101(3) discusses the relevant "transaction" supports the idea that Section 14-11-307 applies to business transactions, like the purchase, sale, or development of assets or the borrowing of money, and not to other actions that might be taken by a limited liability company. Section 14-11-101(3) defines a "conflicting interest" as one where the member or a related person is a "party to the transaction" or

---

[15] Section 14-11-307 does apply to Debtor, because no operating agreement says it does not or alters the terms of the section. O.C.G.A. § 14-11-307(a).

[16] Given the terms typically used in the LLC Act when describing who can undertake what actions on behalf of a limited liability company, it would not be reasonable to read "transaction" as used in Section 14-11-307 to mean any decision made by the limited liability company. The other authority sections of the LLC Act use the terms "business and affairs" and "execution of any instrument" (Section 14-11-301(a)), "management of the business and affairs," "manage affairs" and "make decisions" (Section 14-11-304(a)), and "any matter arising in connection with the business and affairs of the limited liability company" (Section 14-11-308(a)(1)). Thus, it would be reasonable to assume the term "transaction" applies to some narrower group of decisions that could be fairly characterized to be a "transaction" as that term is normally used – i.e. something akin to the purchase or sale of material assets or the borrowing of material funds. "Transaction" as so defined would not include the filing of a bankruptcy case.

10

has a "beneficial financial interest" in the "transaction" that is of such a "financial significance" to the member that it would influence the member's judgment. These terms are terms that are used regarding business transactions, not regarding the decision to commence litigation (including a bankruptcy case).[17] Further, if these terms somehow apply to the filing of the Petition, and if they apply to Mr. Silva (which appears doubtful),[18] then they surely apply equally to Mr. Levy, leaving no one without a "conflicting interest" to approve the filing of the Petition.

Further, looking at the section more generally, O.C.G.A. § 14-11-307 appears to be a safe harbor provision that applies in situations where a breach of fiduciary duty could be alleged, and protects limited liability company members with potential conflicting interests (and the integrity of the transactions themselves) so long as transactions that are otherwise duly authorized are approved by "qualified" members who have no conflicting interest in the transaction. *See In re Beaulieu Group, LLC,* 2021 WL 4469928, *14 (Bankr. N.D. Ga. Sept. 29, 2021). This provision helps a transaction proceed even when a member or manager would receive a material financial benefit from the company's decision to purchase, sell, or exchange goods or services or borrow money.[19] Nothing in this code section authorizes an allegedly non-conflicted party to proceed with a "transaction"

---

[17] This conclusion is bolstered by the way "transaction" is described elsewhere in the definition of "conflicting interest"("a transaction effected or proposed to be effected"), and in the definition of "time of commitment" in Section 14-11-101(24)(defining it as the time when the "transaction is consummated or, if made pursuant to a contract, the time at which the limited liability company becomes contractually obligated"). The words "effected" and "consummated" are again used in connection with business transactions, and not litigation.

[18] Attempting to apply these inapplicable words to the filing of the Petition, Mr. Silva would have to have a "beneficial interest" in the filing, or be a party to it. It is not clear how someone would have a "beneficial interest" in a bankruptcy filing. That does not seem to apply to Mr. Silva here, but if it does, it also would seem to apply to Mr. Levy. Similarly, if Mr. Silva were somehow a "party" to the bankruptcy case, then Mr. Levy would have to be one as well.

[19] The presumption underlying Section 14-11-307 is that the party with the "conflicting interest" is in favor of the transaction because that party's status as a "party" or the holder of a "beneficial interest" in the "transaction" would confer on the party some benefit not arising from their ownership in the limited liability company. The section then allows the "transaction" to proceed so long as (i) adequate disclosure is made (Sections 14-11-101(22), 307(d), 307(e)) and the parties without a "conflicting interest" nevertheless approve the "transaction" (Section 14-11-307(d)) or (ii) the transaction is fair to the limited liability company (Section 14-11-307(c)(2)). Nothing in Section 14-11-307 addresses the circumstance where the allegedly conflicted member does not want the limited liability company to engage in the "transaction" at issue, particularly where that member's approval would otherwise be needed to proceed.

unilaterally, without the otherwise-required decisional majority and without even informing the other party of the potential decision before it is made and implemented.[20] *See Id.* at *21 (concluding that defendants did not establish the defense of Section 14-11-307 on its face because there were not enough facts about the approval of each challenged transaction).

Finally, the Amended Corporate Resolution mentions several sections of the LLC Act upon which it relies for authority. It does not mention Section 14-11-307 at all, belying the notion that Debtor relied on that authority in filing the Petition.

In view of the foregoing, under the LLC Act, Debtor was not properly authorized to file for bankruptcy. Thus, Mr. Silva has established by a preponderance of the evidence that the filing of the Petition was not authorized under either the Alleged Operating Agreement or under Georgia law, and this case must be dismissed. In light of the foregoing, it is hereby

**ORDERED** that the Motion is **GRANTED** as follows:

1. The above-captioned case be, and the same hereby is **DISMISSED** pursuant to 11 U.S.C. § 1112.

2. Any and all other motions currently pending before the Court in this bankruptcy case are denied as moot.[21]

3. In light of the dismissal of this bankruptcy case, the Order to Maintain Funds is vacated under 11 U.S.C. § 349(b)(2).

---

[20] Debtor sent Mr. Silva the "Notice of Action Without Meeting" letter in compliance with O.C.G.A. § 14-11-309(4). Section 14-11-309, however, is not a grant of authority to act, but only excuses the members from holding a formal meeting. Section 14-11-309 does not excuse compliance with the requirement in Section 14-11-308 of majority approval of a business matter, but instead dispenses with the need for a meeting where members with sufficient voting power agree to take action without having a meeting. *See* O.C.G.A. § 14-11-309(1)("Action required or permitted by this chapter to be taken by members or managers may be taken without a meeting if the action is taken..., by persons who would be entitled to vote *not less than the minimum number of votes that would be necessary to authorize or take the action*...")(emphasis added).

[21] The Adversary Proceeding, and any motions currently pending in the Adversary Proceeding, will be addressed by the Court through separate order.

12

4. The Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation or implementation of this Order.

5. The Clerk shall close this case in the ordinary course after entry of this Order.

The Clerk is directed to serve a copy of this Order upon Debtor, counsel for Debtor, Mr. Silva, counsel for Mr. Silva, the Subchapter V Trustee, the United States Trustee, and all other creditors and parties in interest in this case.

**[END OF DOCUMENT]**